# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 09-00159-01-W-ODS |
| Johun L. Anderson, | ) | |
| | ) | |
| Defendant. | ) | |

## Report and Recommendation

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR HEARINGS filed on March 25, 2010 [Doc. 30] by defendant Johun L. Anderson ("Anderson"). On May 6, 2010, the undersigned held an evidentiary hearing on the defendant's motion. Anderson was present and was represented by his counsel, John G. Gromowsky. The government was represented by Assistant United States Attorneys Brent Venneman and Patrick Daly. At the evidentiary hearing, the government called two witnesses, Detective Manuel Anchondo and Officer Matthew Masters both with the Kansas City Missouri Police Department. Anderson called one witness, Ms. Shiloh Horn. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Govt. ##1-6 | Photographs of the apartment |
| Deft. #10 | Google map |
| Deft. ##11-12 | Satellite images |
| Deft. #13 | Search warrant documents |

1

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT[1]

1.      Manuel Anchondo is a Detective with the Kansas City, Missouri P:olice Department. Tr. at 5.

2.      In 2008, Det. Anchondo was assigned to the Street Narcotics Unit. Tr. at 5.

3.      On two occasions prior to August 21, 2008, Det. Anchondo, acting undercover, had approached Dion Brown on the street and purchased cocaine base from Mr. Brown. Tr. at 7.

4.      After the first of these drug buys, Mr. Brown provided Det. Anchondo with a telephone number to contact him for future drug buys. Tr. at 7.

5.      On August 21, 2008, at approximately 8:30 p.m., Det. Anchondo called the telephone number provided by Mr. Brown and arranged to purchase cocaine base. Tr. at 6-8.

6.      Det. Anchondo was told to go to the area near Ninth St. and Gladstone Blvd. and call again when he was at the location. Tr. at 8.

7.      After arriving at the site, Det. Anchondo called the telephone number and a man emerged from the apartment building at 815½ Gladstone Blvd. Tr. at 8-10, 17.

8.      The man was Anderson. Tr. at 8-12, 17.

9.      Anderson approached Det. Anchondo's vehicle, entered the vehicle, and proceeded to sell cocaine to Det. Anchondo. Tr. at 9-10.

10.     After the drug buy, Anderson exited Det. Anchondo's vehicle and Det. Anchondo drove away from the scene. Tr. at 10.

---

[1] In reaching these conclusions, the Court has been required to make some credibility determinations, particularly as they pertain to Ms. Horn's recitation of the facts and circumstances surrounding her statements to Officer Masters as compared to Officer Masters' testimony regarding the elicitation of those statements. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. In the end, the Court concluded that Officer Masters was a more credible witness regarding the incidents on August 21, 2010.

11.     While driving away, Det. Anchondo alerted the tactical teams positioned in the area where the drug buy had occurred.  Tr. at 10, 17

12.     Matthew Masters is an Officer with the Kansas City Missouri Police Department.  Tr. at 23.

13.     On August 21, 2008, Officer Masters was assigned as a Tactical Enforcement Officer with the Street Narcotics Unit in support of the buy/bust operation associated with Det. Anchondo's undercover drug purchase.  Tr. at 23-24.

14.     After Det. Anchondo completed his drug buy and passed along a description of the buyer, Officer Masters and the other members of the tactical team approached the apartment building at 815½ Grand Blvd. to arrest Anderson.  Tr. at 28-29.

15.     When Anderson saw the officers he began running toward the door of the apartment building.  Tr. at 30.

16.     The officers then began running after Anderson.  Tr. at 30-31.

17.     Anderson ran up the steps of the apartment building and through the common door (which he locked with a deadbolt behind him).  Tr. at 31-32, 70.

18.     From his vantage point outside the apartment building, Officer Masters observed Anderson go to the second floor and enter an apartment on the second floor.  Tr. at 32-33, 77-78.

19.     After officers had forced open the common door to the apartment, they went upstairs and knocked on the apartment door announcing themselves as "Police."  Tr. at 33.

20.     No one in the apartment responded to the officers.  Tr. at 50.

21.     After some time passed and no one opened the door to the apartment, Officer Masters climbed out through a second floor window in the common area on to a balcony for the apartment.  Tr. at 34-35.

22.     Officer Masters could see movement in the apartment and was able to generally identify two black males and one white female in the apartment.  Tr. at 37.

23.     Based on the movements of these individuals, Officer Masters was concerned that evidence was being destroyed.  Tr. at 37.

24.     At this same time, a woman – Shiloh Horn – approached the apartment building and told officers on the scene that she was the renter of the apartment.  Tr. at 38-39.

25. Officer Masters left the balcony and explained to Ms. Horn that the officers were conducting a buy/bust operation and that a subject ran when he saw the police and went into her apartment. Tr. at 39.

26. Ms. Horn said that the only person that would be in her apartment was her boyfriend. Tr. at 40.

27. Officer Masters asked Ms. Horn if the officers could go into her apartment. Tr. at 40.

28. Ms. Horn "said she was more than willing to let [officers] go in and get those people out of her apartment" and she started to hand Officer Masters her keys. Tr. at 40.

29. Before handing the key over to Officer Masters, Ms. Horn asked Officer Masters if she could call her boyfriend and see if he was inside the apartment. Tr. at 40.

30. Ms. Horn made a call and then informed Officer Masters that her boyfriend was inside the apartment. Tr. at 41.

31. Officer Masters then asked Ms. Horn if she would have him (her boyfriend) come out of the apartment. Tr. at 41.

32. Ms. Horn then called her boyfriend again. Tr. at 41.

33. About a minute later, Ms. Horn's boyfriend (later identified as Anderson) opened the apartment door. Tr. at 41-42, 44.

34. The officers then detained Anderson and two other individuals just inside the front door of the apartment. Tr. at 42-43.

35. The other two individuals in the apartment were Mr. Brown and a woman named Samantha Tigner. Tr. at 43.

36. The three individuals were then taken out of the building and Det. Anchondo drove by on the street and identified Anderson as the person who had made the drug buy earlier that evening and Mr. Brown as the individual making the two prior drug buys. Tr. at 17-18, 80-81.

37. Officer Masters then asked Ms. Horn for consent to walk through the apartment and ensure that no other individuals were in the apartment. Tr. at 45.

38. Ms. Horn consented to the search. Tr. at 45.

39. Thereafter, the officers performed a sweep of the apartment. Tr. at 45.

40. The sweep did not disclose any other individuals, but officers did see crack cocaine laying on a bed, plastic baggies swirling inside of the toilet bowl, and the butt of a rifle in an opened closet. Tr. at 45-46.

41. The officers did not immediately seize the items. Tr. at 46-47.

42. Ms. Horn was then told that law enforcement officers were going to seek a search warrant for the apartment. Tr. at 47-48.

43. Ms. Horn then left the premises. Tr. at 49.

44. A search warrant was obtained later that evening and it was served about 20-30 minutes after midnight. Tr. at 48, 87.

45. The search recovered the previously noted items as well as other contraband. Tr. at 48.

46. During the search, Ms. Horn returned to the apartment and she was arrested at the scene and booked on a 24-hour investigative hold. Tr. at 49.

47. Because Ms. Horn was in detention at the conclusion of the search and not at the apartment, a copy of the search warrant was left in the apartment at the conclusion of the search. Tr. at 49-50.

## PROPOSED CONCLUSIONS OF LAW

In his MOTION TO SUPPRESS, Anderson asserts that law enforcement officers violated his constitutional rights, as well as Missouri statutory law, in their actions on the evening of August 21, 2008, and the early morning hours of August 22, 2008. Specifically, Anderson alleges:

(1) law enforcement officers conducted an improper warrantless search when they stationed themselves on the balcony outside the apartment and when they entered the apartment to arrest Anderson.

(2) law enforcement officers conducted an additional improper warrantless search of the apartment when they conducted a sweep of the apartment following Anderson's arrest,

(3) the search warrant ultimately obtained by law enforcement officers was improperly obtained because the officers failed to disclose critical facts, and

(4) law enforcement officers violated MO. REV. STAT. § 542.291.4 when they failed to provide a copy of the search warrant to Ms. Horn.

The Court will briefly address each contention.

Without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment. *See*, *e.g.*, *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 2000). As protection for the citizen from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a court-sanctioned search warrant based on probable cause before undertaking a search of private property. *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000). Those privacy interests are particularly enhanced when a search of an individual's domicile or residence is at issue. *See*, *e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097 (1984) ("It is axiomatic that the physical entry of the house is the chief evil which the wording of the Fourth Amendment is directed."). In this case, the law enforcement officers did not obtain a search warrant until after they had already entered the apartment at 815½ Gladstone Blvd., arrested Anderson, and observed incriminating materials in the apartment.

While it is true in most cases that police officers may not enter or search a home without a warrant authorizing them to do so, it is nonetheless settled constitutional law, as well as common sense, that emergency circumstances may take precedence over traditional Fourth Amendment concerns and permit law enforcement officers to take actions that might otherwise require a warrant.

> Police officers may not enter or search a home without a warrant unless justified by exigent circumstances. . . . The exception justifies immediate police action without obtaining a warrant if

lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed.

*United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). In assessing these potential dangers, "[t]he question . . . is not whether there was actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Columbia*, 27 F.3d 1346, 1353 (8th Cir. 1994).

In this case, under the particular facts presented, the Court concludes that the law enforcement officers did reasonably perceive exigent circumstances at the time they made the decision to surround 815½ Gladstone Blvd., to climb on to the balconies for 815½ Gladstone Blvd., and to enter the subject apartment and detain Anderson and the other occupants. At time the officers made that decision, they had reason to believe:

- One of the occupants had just sold drugs to an undercover officer.

- Upon seeing law enforcement officers approaching the apartment building, one of the occupants of the apartment had run into the building, locked the door leading into the common area, and run into the upstairs apartment and locked that door.

- Despite repeated knocking on the door and announcements of police presence, the occupants of the apartment refused to even acknowledge that anyone was inside the apartment.

- There were three individuals in the apartment who could be seen from the balcony moving around in a manner consistent with the destruction of evidence.

- The owner of the apartment reported that only one person – her boyfriend – should be in the apartment.

Based on this evidence, an objectively reasonable officer on the scene could have believed that there was an exigency and that contraband inside of 815½ Gladstone Blvd. was being destroyed[2] and/or there was an immediate danger to innocent third persons. These circumstances justified all of the officers actions up to and including entry of the apartment (after Anderson opened the door) to arrest the occupants.

However, the presence of exigent circumstances does not afford law enforcement officers *carte blanche* permission to undertake any actions. Instead, it is understood that when confronted with exigent circumstances involving the possible destruction of evidence, the officers' "entry must be limited in scope to the minimum intrusion necessary to prevent the destruction of evidence." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). Similarly, when there is a concern that innocent bystanders are endangered, the officers' actions are justified only to the extent necessary to dispel such danger. In this case, the Court finds that the officers properly limited their "exigent" conduct upon entry by securing the three known occupants.

---

[2] The circumstances presented by the facts of this case are akin to those at issue in *United States v. Leveringston*, 397 F.3d 1112 (8th Cir. 2005), where the court found exigent circumstances justified a warrantless entry into a motel room.

> The [defendant] reacted to police knocking by looking through curtains, expressing surprise, and then immediately shutting the curtains. This response was followed by sounds of pots and pans slamming, dishes breaking, water flowing, and a garbage disposal running. The officers reasonably could infer that these sounds indicated the destruction of evidence of drug trafficking in response to the presence of the police.

*Id*. at 1116.

Having limited the scope of their initial foray into the apartment at 815½ Gladstone Blvd., the officers again acted appropriately in conducting the ensuing sweep of the apartment to ensure that no one else was present. Such a sweep may have been proper in any such situation, but – in the present case – it was undertaken after obtaining consent of the apartment's resident, Ms. Horn. Thus, with regard to the "sweep" search of the apartment at 815½ Gladstone Blvd., while law enforcement officers admittedly conducted the search without the benefit of a warrant, it is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1804 (1991).

Merely because a suspect consents to a search, however, does not afford law enforcement an unfettered opportunity to disregard the constraints of the Fourth Amendment. Inasmuch as it falls within an established exception to the Fourth Amendment warrant requirement, "[a] consensual search may not exceed the scope of the consent given." *United States v. Randolph*, 970 F.2d 467, 468 (8th Cir. 1992). To that end:

> The standard for measuring the scope of [an individual's] consent under the Fourth Amendment is that of "objective" reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the [individual]?

*Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1803-04. Moreover "[t]he scope of a [consensual] search is generally defined by its <u>expressed object.</u>" *Id*. (*emphasis added*). In this case, the officers obtained permission to conduct a protective sweep of the apartment first and Ms. Horn consented. As was thus appropriate, the officers limited that search to ascertaining whether any other individuals were present in the apartment.

9

In the course of performing the protective sweep, officers noted several items in the house in plain view including a weapon in an open closet, plastic bags swirling around in the toilet, and a cocaine-like substance on a bed. Thereafter, officers did not seize the contraband, but rather sought and obtained a search warrant for the apartment at 815½ Gladstone Blvd. The conduct of the officers fully conformed with the Constitution.

Anderson argues that probable cause was lacking to support the issuance of the warrant in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674 (1978). The Court disagrees. The role of a court reviewing a search warrant "is to ensure that the evidence as a whole provides a substantial basis for finding probable cause to support the issuance of the search warrant [and the] existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (*citations omitted*). *See also United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416 (1984) ("the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination" as to whether an affidavit establishes probable cause.).

Reviewing the affidavit supporting the issuance of this search warrant,[3] the Court has no difficulty in concluding that the search warrant was issued with the requisite probable cause. To prevail on a *Franks* challenge to a search warrant application, a defendant must establish "that a false statement was included in the affidavit knowingly and intentionally or with reckless

---

[3] "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir.1999) (*quoting United States v. Gladney*, 48 F.3d 309, 312 (8th Cir.1995)).

disregard for its truth, and that the affidavit's remaining content is insufficient to establish probable cause." *United States v. Roberson*, 439 F.3d 934, 939 (8th Cir. 2006). In addition, while *Franks* involved a false statement included in an affidavit, its reasoning has been extended to allow challenges to affidavits based on alleged deliberate omissions. *See*, *e.g.*, *United States v. Jacobs*, 986 F.2d 1231, 1234 (8th Cir.1993); *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980). To prevail on a *Franks* claim based on an omission of fact, the defendant must prove (1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, and (2) that the affidavit, if supplemented with the omitted information, would not have been sufficient to support a finding of probable cause. *United States v. Allen*, 297 F.3d 790, 795 (8th Cir.2002).

In this case, Anderson argues that the search warrant affidavit failed to include information:

> (1) "that officers made repeated demands that [Anderson] open the door and admit the officers," and
>
> (2) "that officers had laid siege to the apartment, including the fact that two officers scaled the building and occupied the apartment's balcony.

Based on the allegations raised by Anderson, the Court does not find that he has made "a strong initial showing 'of deliberate falsehood or of reckless disregard for the truth'" sufficient to warrant a *Franks* hearing. *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir. 1995) (*quoting*, *in part*, *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684). Moreover, the Court concludes that the alleged omissions were not material and even if the omitted matters are added to the search warrant affidavit, the search warrant would still have been properly issued.

11

Finally, Anderson alleges that the search warrant for the apartment at 815½ Gladstone Blvd. should be invalidated because officers failed to comply with MO. REV. STAT. § 542.291.4. That statute provides:

> If any property is seized [during the execution of a search warrant], the officer shall give to the person from whose possession it is taken, if he is present, a copy of the warrant and an itemized receipt of the property taken. If no person is present, the officer shall leave the copy and the receipt at the site of the search.

MO. REV. STAT. § 542.291.4. Similarly, the Federal Rules of Criminal Procedure provide:

> The officer executing [a search] warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

FED. R. CRIM. P. 41(f)(1)(C).

Anderson argues that the search warrant in this case should be invalidated because it was not given to Ms. Horn. The Court rejects this argument. The credible evidence established that a copy of the search warrant was left in the apartment at the conclusion of the search because Ms. Horn was not present (having been arrested and held in custody by the police). This action satisfies both Missouri substantive law and federal procedural law.

Moreover, even if there was some technical violation regarding execution of the search warrant, suppression of evidence would not be warranted. The Eighth Circuit has noted that in such cases, "exclusion is required only if a defendant is prejudiced or if reckless disregard of proper procedure is evident." *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir.2006). In this case, there is no evidence of reckless disregard. Additionally, the Court doubts that Anderson could establish prejudice inasmuch as any violation went to Ms. Horn's rights as the

apartment owner. To the extent that there was any problem with the search warrant, it is doubtful that Anderson has standing to object.[4]

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** Anderson's MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR HEARINGS filed on March 25, 2010 (Doc. #30), and **DENYING** Anderson's request for a separate *Franks* hearing.

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*
**John T. Maughmer
United States Magistrate Judge**

---

[4] It well established that Fourth Amendment rights are personal rights that may not be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S.Ct. 421, 425 (1978). Consequently, a criminal defendant asserting Fourth Amendment rights relating to a search "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable [.]" *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 472 (1998). In that regard, "[i]f a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir.1994).